IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE
NORTHEASTERN DIVISION


BARBARA FLETCHER                    )
                                    )
v.                                  )          No. 2:10-0109
                                    )
MICHAEL J. ASTRUE,                  )
Commissioner of Social Security     )



To: The Honorable Thomas A. Wiseman, Jr., Senior District Judge



## REPORT AND RECOMMENDATION

The plaintiff filed this action pursuant to 42 U.S.C. § 405(g) to obtain judicial review of the

final decision of the Commissioner of Social Security ("Commissioner") denying the plaintiff's

claims for Supplemental Security Income ("SSI") and Disability Insurance Benefits ("DIB"), as

provided by the Social Security Act ("the Act").

Upon review of the Administrative Record as a whole, the Court finds that the

Commissioner's determination that the plaintiff is not disabled under the Act is supported by

substantial evidence in the record as required by 42 U.S.C. § 405(g), and that the plaintiff's motion

for judgment on the administrative record (Docket Entry No. 12) should be denied.


## I. INTRODUCTION

The plaintiff filed applications for SSI and DIB on July 27, 2007, alleging a disability onset

date of May 1, 2004, due to a heart attack, stent placement, diabetes, rheumatoid arthritis, diabetic

neuropathy, high blood pressure, anxiety, and depression. (Tr. 93-100, 127.) Her applications were

denied initially and upon reconsideration. (Tr. 51-54, 59-62.) A video hearing before Administrative Law Judge ("ALJ") Andrew G. Sloss was held on October 28, 2009 (tr. 24-40),[1] and the plaintiff amended her alleged onset date to November 23, 2005. (Tr. 30.) The ALJ delivered an unfavorable decision on December 2, 2009 (tr. 11-21), and the plaintiff sought review by the Appeals Council. (Tr. 6.) On September 14, 2010, the Appeals Council denied the plaintiff's request for review (tr. 1-3), and the ALJ's decision became the final decision of the Commissioner.

## II. BACKGROUND

The plaintiff was born on November 23, 1955, and was 50 years old as of November 23, 2005, her alleged onset date. (Tr. 30, 98.) The plaintiff completed high school and one year of nursing school. (Tr. 30.) She worked as a licensed practical nurse. (Tr. 149, 169.)

### A. Chronological Background: Procedural Developments and Medical Records

Between October of 1988, and April of 2002, the plaintiff presented to Mississippi Baptist Medical Center on multiple occasions and she was diagnosed with chest pain, right shoulder pain, right ankle pain, abdominal pain, osteoarthritis, asthma, and a herniated cervical disc at C6-7, and she underwent a stent of the right coronary artery, a cervical myelogram, a cervical hemilaminectomy at the C6-7 disc, a cholecystectomy, and a right salpingo-oophorectomy. (Tr. 184-349.) From January of 2000, to April of 2002, the plaintiff presented to Central Mississippi Medical Center and was diagnosed with migraines, right lower abdominal pain, a right ankle sprain, an

---

[1] The ALJ was in Knoxville, Tennessee. The plaintiff, a non-attorney representative, and the vocational expert appeared in Cookeville, Tennessee.

"[a]cute inferior myocardial infarction,"[2] "[t]riple-vessel coronary artery disease," and hyperlipidemia. (Tr. 350-83.) An August 9, 2004, nuclear stress test revealed that the plaintiff was "clinically negative for chest pain and electrocardiographically negative for ischemic EKG changes." (Tr. 445.)

Between September of 2004, and August of 2007, the plaintiff presented to Dr. Eric Fox on multiple occasions for hormone replacement therapy ("HRT") and with complaints of insomnia, migraines, cold symptoms, coughing, right side rib pain, right ankle pain, foot pain, hand pain, back pain, chest discomfort, arthritic pain, depression, and anxiety. (Tr. 384-452, 484-97.) He noted that the plaintiff's weight fluctuated between 128 pounds and 164 pounds and that she was five feet tall (tr. 392, 394, 396, 398, 401, 403, 406, 409, 411, 414, 420, 423, 431, 485); diagnosed her with insomnia, migraines, diabetes, dyslipidemia, hypertension, allergic rhinitis, Chronic Obstructive Pulmonary Disease ("COPD"), coronary artery disease, costochondritis, a right ankle sprain, peripheral neuropathy, chest tightness, anxiety, depression, osteoarthritis pain, rheumatoid arthritis, and lower back pain; and prescribed Aspirin, Estradiol, Delestrogen, Plavix, Sonata, Ambien, Avandamet, Lantus, Decadron, Prednisone, Medrol Dosepak, Singulair, Nasacort, Endal-HD, Augmentin, Levaquin, Advair, Toradol, Naprelan, Naprosyn, Lortab, Ultracet, Percocet, Prozac, Cymbalta, Lexapro, Trazodone, Xanax, Alprazolam, Vistaril, Phenergan, Lovastatin, Methotrexate, and Tizanidine.[3] (Tr. 384-452, 484-97.)

---

[2] An acute myocardial infarction is a heart attack. Dorland's Illustrated Medical Dictionary 928 (30th ed. 2003) ("Dorland's").

[3] Estradiol and Delestrogen are synthetic estrogen prescribed to treat postmenopausal disorders and osteoporosis; Plavix is a "platelet aggregation inhibitor for stroke, myocardial infarction, peripheral artery disease, and acute coronary syndrome;" Sonata and Ambien are prescribed for insomnia; Avandamet and Lantus are used to treat diabetes; Decadron, Prednisone,

On September 20, 2007, Stephen Hardison, M.A., a consultative psychological examiner, completed a psychological evaluation (tr. 455-59) and noted that the plaintiff "appear[ed] in some physical discomfort during the evaluation" and had a depressed mood with flat affect. (Tr. 455.) The plaintiff related that she had "chronic problems with arthritis and diabetic neuropathy;" felt depressed; is able to prepare simple meals, drive, shop for groceries, occasionally work outside, and perform "some chores" but she "cannot sit or stand for long." (Tr. 457.) Mr. Hardison diagnosed the plaintiff with anxiety disorder, not otherwise specified ("NOS") and depression "with things relating greatly to her chronic pain problems." (Tr. 458.) He also concluded that the plaintiff was not significantly limited in her ability "to remember and carry out basic 1- and 2-step instructions," "to remember and carry out somewhat more detailed instructions," "to respond appropriately to change in a routine work setting including being aware and take appropriate precautions regarding normal hazards," and "to set realistic goals and make plans independently," and that she was mildly to moderately limited in her ability "to sustain concentration and persistence" and to interact socially. *Id.*

On September 24, 2007, Dr. Daniel Kan, a consultative examining physician, completed a medical evaluation (tr. 460-64) and noted that the plaintiff weighed 147 pounds, had a slow but

---

and Medrol Dosepak are an anti-inflammatories; Singulair Nasacort, and Endal-HD are used to treat allergies and asthma; Augmentin and Levaquin are antibiotics; Advair is an inhalation aerosol used to treat COPD; Toradol, Naprelan, and Naprosyn are nonsteroidal anti-inflammatories (NSAID) used to treat mild to moderate pain; Lortab, Ultracet, and Percocet are pain relievers; Prozac, Cymbalta, Lexapro, and Trazodone are selective serotonin re-uptake inhibitors used to treat depression, panic attacks, and anxiety; Xanax and Alprazolam are prescribed to treat panic disorders and agoraphobia; Vistaril is a minor tranquilizer; Phenergan is an antihistamine; Lovastatin is prescribed for hypercholesterolemia and hyperlipidemia; Methotrexate is prescribed for rheumatoid arthritis; and Tizanidine is a skeletal muscle relaxant. Saunders Pharmaceutical Word Book 15, 33, 37, 71-72, 196, 204, 207, 260, 270, 397, 402, 405, 413, 415, 433, 444, 479-80, 491, 546, 551, 563, 575, 644-45, 654, 709, 712, 716, 739, 758, 768 (2009) ("Saunders").

steady gait, and had "4/5 to 5/5 strength of the upper extremities . . . [and] 4/5 in both lower extremities." (Tr. 461-63.)  He diagnosed the plaintiff with diabetes and with "[r]ule out" coronary artery disease and arthritis and found that

> [i]n regard to work expectations on the basis of previous history, physical findings and without the benefit of full medical records, diagnostic radiological and neuropsychological testing, it is estimated that the claimant may be able to occasionally lift light weights.  She may be able to stand and walk for 1- to 2-hour periods and may be able to sit for about 6 hours in an 8-hour work period with normal breaks.

> Of note, that patient was observed when she left the office and was walking and driving without difficulties when compared to her performance in the office where she was hardly able to move.

(Tr. 463-64.)

On October 10, 2007, George W. Livingston, Ph.D., a nonexamining Tennessee Disability Determination Services ("DDS") psychologist, completed a Psychiatric Review Technique Form ("PRTF") (tr. 465-78) and diagnosed the plaintiff with anxiety disorder, nos. (Tr. 470.)  He concluded that the plaintiff had moderate restriction of activities of daily living and moderate difficulties maintaining social functioning, concentration, persistence, or pace. (Tr. 475.) Dr. Livingston noted that there was "insufficient evidence" pertaining to the plaintiff's episodes of decompensation[4] and that the record medical evidence "establishes a mental impairment that is more than non-severe, but that does not meet or equal any listing," that the "[m]ental limitations indicated by various sources are generally consistent," and that the "limitations indicated by the [claimant] are viewed as generally credible." (Tr. 475, 477.)

---

[4] Decompensation is the "failure of defense mechanisms resulting in progressive personality disintegration." Dorland's Illustrated Medical Dictionary 478 (30th ed. 2003) ("Dorland's").

Dr. Livingston also completed a mental Residual Functional Capacity ("RFC") assessment (Tr. 479-82) and opined that the plaintiff was moderately limited in her ability to understand, remember, and carry out detailed instructions; in her "ability to maintain attention and concentration for extended periods;" in her "ability to sustain an ordinary routine without special supervision;" in her "ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods;" in her "ability to interact appropriately with the general public;" and in her "ability to respond appropriately to changes in the work setting." (Tr. 479-80.)

In November and December of 2007, the plaintiff returned to Dr. Fox on two occasions with complaints of anxiety and joint pain. (Tr. 498-507.)  Dr. Fox diagnosed her with diabetes, rheumatoid arthritis, osteoarthritis, chronic pain syndrome, hip pain, knee pain, and lower back pain; noted that her hypertension, coronary artery disease, and anxiety were stable; and prescribed Alprazolam, Hydrochlorothiazide,[5] Hydroxyzine, Lyrica,[6] Lortab, and Ultram.  (Tr. 500-01, 507.)

On December 26, 2007, Dr. Frank R. Pennington, a nonexamining consultative DDS physician, completed a physical RFC assessment (tr. 508-15) and opined that the plaintiff could lift/carry 50 pounds occasionally and 25 pounds frequently, that in an eight hour workday she could sit or stand for about six hours, and that her ability to push/pull was unlimited. (Tr. 509.)  He also found that the plaintiff could frequently climb ramps and stairs, balance, stoop, kneel, crouch, and crawl; could occasionally climb ladders, ropes, or scaffolding; and should avoid concentrated exposure to extreme heat and cold. (Tr. 512.)

---

[5] Hydrochlorothiazide is an antihypertensive that is used to treat hypertension. Saunders at 351.

[6] Lyrica is prescribed to manage neuropathic pain. Saunders at 420.

On April 10, 2008, the plaintiff presented to Dr. Fox with complaints of mild to moderate lower back pain that radiated down to her right hip. (Tr. 530-33.) Dr. Fox found that the plaintiff had spinal pain with movement; diagnosed her with muscle spasms, right sciatica, and anxiety; noted that her hypertension and coronary artery disease were stable; and prescribed Flexeril,[7] Alprazolam, Hydrochlorothiazide, Lortab, and Lyrica. *Id.*

On December 26, 2007, Dr. Saul A. Juliao, a nonexamining consultative DDS physician, completed a physical RFC assessment (tr. 516-23) and opined that the plaintiff could lift/carry 50 pounds occasionally and 25 pounds frequently, that in an eight hour workday she could sit or stand for about six hours, and that her ability to push/pull was unlimited. (Tr. 517.) He also found that the plaintiff's "pain and fatigue statement is partially credible due to" the record medical evidence and that the plaintiff could frequently climb ramps and stairs, balance, stoop, kneel, crouch, and crawl; could occasionally climb ladders, ropes, or scaffolding; and should avoid concentrated exposure to extreme heat and cold and to vibrations. (Tr. 518, 520.)

On June 23, 2008, the plaintiff presented to the Emergency Department of the Cookeville Regional Medical Center ("CRMC") after being struck by a forklift (tr. 604-13)[8] and feeling pain in her "[right] flank area and numbness/tingling [in her right] leg." (Tr. 609.) A CT-scan of her lower back showed mild degenerative changes at L3-4 and L4-5 but "[n]o fracture or evidence of

---

[7] Flexeril is a skeletal muscle relaxant. Saunders at 294.

[8] These records inconsistently refer to the plaintiff having been hit by a car and by a forklift. The plaintiff indicates that she suffered a "trauma" on August 29, 2009, *see* Docket Entry No. 12-1, at 6, but the medical records to which she cited are dated June 23, 2008. (Tr. 606-07.) August 29, 2009, is the date the records were printed, not the date of her injury. The ALJ found that, in August of 2008, the plaintiff "slipped at a retail store and injured her back." (Tr. 18.) Whether she "slipped" or was otherwise injured, there are no medical records reflecting that the incident occurred in August of 2008, and the emergency room records and Dr. Fox's treatment records reflect that the plaintiff was injured at Lowe's on June 23, 2008. (Tr. 541, 606.)

central canal stenosis" (tr. 609-11), and an x-ray of her pelvis was "normal." (Tr. 613.) The plaintiff was diagnosed with moderate lower back pain (tr. 607) and was prescribed Dilaudid[9] and Phenergan. (Tr. 605.)

Between July of 2008, and July of 2009, the plaintiff presented to Dr. Fox on multiple occasions for diabetes and with complaints of lower back pain, "pain with ambulation," and arthritic pain. (Tr. 535-92.) Dr. Fox noted that the plaintiff's weight fluctuated between 132 and 153 pounds (tr. 538, 563, 572, 575, 580, 588, 591) and that she reported that her lumbar pain was a six out of ten at rest and ten out of ten with activity. (Tr. 550.) He diagnosed the plaintiff with diabetes, bilateral diabetic neuropathy, insomnia, anxiety, lower back pain, "[d]egeneration of [a] lumbar or lumbosacral intervertebral disc," chronic pain syndrome, and muscle spasms (tr. 557, 576, 581, 589, 591); opined that her lower back pain, muscle spasms, hypertension, hyperlipidemia, coronary artery disease, osteoarthritis, anxiety, and insomnia were stable (tr. 539, 557, 569, 573, 581); and prescribed Flexeril, Meloxicam, Hydrocodone, Oxycodone, Morphine, Toradol, Lisinopril, Lipitor, Zolpidem, Hydroxyzine, Lantus, Tizanidine, Hydrochlorothiazide, Lyrica, and Amrix.[10] (Tr. 539, 558, 562, 569-70, 573, 576, 581, 589, 592.) The plaintiff also related that, after taking her medication and doing physical therapy, her back was pain free and she "fe[lt] back to normal" (tr. 561); that her lower back pain was "resolved" (tr. 564); that she was doing "fairly well . . . except for pain and numbness at times in her legs" (tr. 571); that she reported that her back pain "has

---

[9] Dilaudid is a pain reliever prescribed for moderate to severe pain. Saunders at 227.

[10] Meloxicam is a NSAID that is prescribed for osteoarthritis and rheumatoid arthritis; Hydrocodone, Oxycodone, and Morphine are strong pain relievers; Lisinopril is an antihypertensive used to treat congestive heart failure; Lipitor is prescribed to treat high cholesterol; Zolpidem is a short term sedative used to treat insomnia; and Amrix is a skeletal muscle relaxant. Saunders at 46, 352, 408, 410, 435, 465, 524, 779.

a dull, aching, and muscle spasm like quality" (tr. 587, 590); and that activities of daily living, climbing stairs, and lifting aggravate her pain. (Tr. 574, 590.)

On September 14, 2009, the plaintiff returned to CRMC with complaints of lower back pain and an MRI of her lower back was normal. (Tr. 594-95.)

**B. Hearing Testimony**

At the hearing, the plaintiff was represented by a non-attorney representative, and the plaintiff and Jane Hall, a vocational expert ("VE"), testified. (Tr. 26-40.) The plaintiff testified that she completed one year of nursing school and is a licensed practical nurse. (Tr. 30.) She related that she is able to drive "just a very short period" because her "legs go numb and [her] back hurts," and she amended her alleged onset date to November 23, 2005. *Id.* The plaintiff testified that she currently was working eight hours a week as a nurse; that she is not able to work full time because she is not able to lift, pull, or grip with her hands due to arthritis, to stand for more than five minutes, or to walk "far" due to diabetic neuropathy in her feet that causes numbness and stinging; that she occasionally has chest pain due to coronary artery disease; and that her physical pain causes anxiety. (Tr. 31-33.) The plaintiff testified that she has continued working eight hours a week as a nurse "in order to have [health] insurance, otherwise I would not have any [health] insurance." (Tr. 36.)

The plaintiff also related that her husband assists her with cooking, doing chores, and grocery shopping; that she is able to walk three to four minutes before stopping to rest; that she is able to sit 10 to 15 minutes at a time; that she takes insulin for her diabetes; that she becomes fatigued after 15 to 20 minutes of activity; that her pain is a seven out of ten when she takes her medication; that

she has rheumatoid arthritis; and that her pain and anxiety medications make her drowsy. (Tr. 33-35, 37.)

The VE confirmed that her testimony would be consistent with the Dictionary of Occupational Titles ("DOT") and testified that the plaintiff's past work as a nurse would be classified as medium and skilled. (Tr. 38-39.)  The ALJ asked the VE what type of work would be available if she considered Dr. Juliao's physical RFC and Dr. Livingston's PRTF and mental RFC, and the VE replied that the plaintiff would have an RFC to perform medium and unskilled work, precluding her from working her past job as a nurse, but that she would be able to work as a food prep worker, cleaner, and assembler. (Tr. 38-39.)  The VE testified that, if the plaintiff were "unable to engage in sustained work activity on a regular and continuing basis for eight hours a day, five days a week, for a 40-hour work week or an equivalent work schedule," she would be precluded from working. (Tr. 39.)  She also opined that the plaintiff did not have any transferable skills "to light or sedentary" work. *Id.*

## III. THE ALJ'S FINDINGS

The ALJ issued an unfavorable decision on December 2, 2009. (Tr. 11-21.)  Based on the record, the ALJ made the following findings:

1.  The claimant meets the insured status requirements of the Social Security Act through March 31, 2009.

2.  The claimant has not engaged in substantial gainful activity since November 23, 2005, the alleged onset date (20 CFR 404.1571 *et seq*., and 416.971 *et seq*.).

\* \* \*

3.      The claimant has the following severe impairments: diabetes, rheumatoid arthritis, and anxiety (20 CFR 404.1520(c) and 416.920(c)). The claimant has the following non-severe impairment: coronary artery disease (CAD).

* * *

4.      The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

* * *

5.      After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform medium work as defined in 20 CFR 414.1567(c) and 416.967(c). She is able to frequently balance, stoop, crouch, crawl, and climb ramps or stairs. She is capable of occasionally climbing ladders/ropes/scaffolds. She is able to perform simple tasks with normal supervision. She must avoid concentrated exposure to extreme heat, cold, and vibrations.

* * *

6.       The claimant is unable to perform any past relevant work (20 CFR 404.1565 and 416.965).

* * *

7.      The claimant was born on November 23, 1955 and was 50 years old, which is defined as an individual closely approaching advanced age, on the alleged disability onset date (20 CFR 404.1563 and 416.963).

8.      The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564 and 416.964).

9.      Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10.     Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the

national economy that the claimant can perform (20 CFR 404.1569, 404.1569(a), 416.969, and 416.969(a)).

\* \* \*

11.     The claimant has not been under a disability, as defined in the Social Security Act, from November 23, 2005 through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).

(Tr. 13-20.)


# IV. DISCUSSION

## A. Standard of Review

The determination of disability under the Act is an administrative decision, and the only questions before this Court are whether the decision of the Commissioner is supported by substantial evidence and whether the Commissioner employed the proper legal standards in reaching his conclusion. 42 U.S.C. § 405(g). *See Richardson v. Perales*, 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed. 2d 842 (1971) (adopting and defining substantial evidence standard in context of Social Security cases); *Kyle v. Comm'r Soc. Sec.*, 609 F.3d 847, 854 (6th Cir. 2010). The Commissioner's decision must be affirmed if it is supported by substantial evidence, "even if there is substantial evidence in the record that would have supported an opposite conclusion." *Blakely v. Comm'r of Soc. Sec.,* 581 F.3d 399, 406 (6th Cir. 2009) (quoting *Key v. Callahan*, 109 F.3d 270, 273 (6th Cir.1997)); *Jones* v. *Comm'r of Soc. Sec.,* 336 F.3d 469, 477 (6th Cir. 2003); *Her v. Comm'r of Soc. Sec.,* 203 F.3d 388, 389-90 (6th Cir. 1999). Substantial evidence is defined as "more than a mere scintilla" and "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson*, 402 U.S. at 401 (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229, 59 S.Ct. 206, 83 L.Ed. 126 (1938)); *Rogers v. Comm'r of Soc. Sec.,* 486 F.3d 234, 241 (6th Cir.

2007); *Le Master v. Weinberger*, 533 F.2d 337, 339 (6th Cir. 1976) (quoting Sixth Circuit opinions adopting language substantially similar to that in *Richardson*).

A reviewing court may not try the case *de novo*, resolve conflicts in evidence, or decide questions of credibility. *See, e.g., Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984) (citing *Myers v. Richardson*, 471 F.2d 1265, 1268 (6th Cir. 1972)). The Court must accept the ALJ's explicit findings and determination unless the record as a whole is without substantial evidence to support the ALJ's determination. 42 U.S.C. § 405(g). *See, e.g., Houston v. Sec'y of Health & Human Servs.*, 736 F.2d 365, 366 (6th Cir. 1984).

The Commissioner must employ a five-step evaluation process in determining the issue of disability. *See, e.g., Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 534 (6th Cir. 2001) (citing *Abbot v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990)). The original burden of establishing disability is on the plaintiff, and impairments must be demonstrated by medically acceptable clinical and laboratory diagnostic techniques. *See* 42 U.S.C. § 1382c(a)(3)(D); 20 C.F.R. §§ 404.1512(a), (c), 404.1513(d). First, the plaintiff must show that she is not engaged in "substantial gainful activity" at the time she seeks disability benefits. *Id.* (citing 20 C.F.R. §§ 404.1520(b), 416.920(b)); *Cruse v. Comm'r of Soc. Sec.*, 502 F.3d 532, 539 (6th Cir. 2007). A plaintiff who is performing substantial gainful activity is not disabled no matter how severe the plaintiff's medical condition may be. *See, e.g., Dinkel v. Sec'y of Health & Human Servs.*, 910 F.2d 315, 318 (6th Cir. 1990).

Second, the plaintiff must show that she suffers from a severe impairment that meets the twelve month durational requirement. 20 C.F.R. §§ 404.1520(a)(4)(ii), 416.920(a)(4)(ii). *See Edwards v. Comm'r of Soc. Sec.*, 113 Fed.Appx. 83, 85 (6th Cir. Sept. 24, 2004). A "severe impairment" is one which "significantly limits . . . physical or mental ability to do basic work

activities." *Barnhart v. Thomas*, 540 U.S. 20, 24, 124 S.Ct. 376, 157 L.Ed.2d 333 (2003) (citing 20 C.F.R. §§ 404.1520(c), 416.920(c)). Basic work activities are "the abilities and aptitudes necessary to do most jobs," such as "walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling; [c]apacities for seeing, hearing, and speaking; [u]nderstanding, carrying out, and remembering simple instructions; [u]se of judgment; [r]esponding appropriately to supervision, co-workers and usual work situations; and [d]ealing with changes in a routine work setting." 20 C.F.R. § 404.1521(b). The Commissioner is required to consider the combined effects of impairments that individually are not severe but cumulatively may constitute a severe impairment. 42 U.S.C. § 423(d)(2)(B); *Foster v. Bowen*, 853 F.2d 483, 490 (6th Cir. 1988).

Third, if the plaintiff is not engaging in substantial gainful activity and is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and her impairment meets or equals a listed impairment, the plaintiff is presumed disabled without further inquiry, regardless of age, education or work experience. *Id.* (citing 20 C.F.R. §§ 404.1520(d), 416.920(d)). The plaintiff may establish that she meets or equals a listed impairment, and that the impairment has lasted or is expected to last for at least twelve months or result in death. *See Listenbee v. Sec'y of Health & Human Servs.*, 846 F.2d 345, 350 (6th Cir. 1988). The plaintiff is not required to show the existence of a listed impairment in order to be found disabled, but such a showing results in an automatic finding of disability. *See Blankenship v. Bowen*, 874 F.2d 1116, 1122 (6th Cir. 1989).

Fourth, if the plaintiff's impairment does not prevent her from doing her past relevant work, she is not disabled. *Id.* The plaintiff has the burden of proving inability to perform past relevant work, or proving that a particular past job should not be considered relevant. *Cruse*, 502 F.3d at 539;

*Jones*, 336 F.3d at 474 ("Through step four, the [plaintiff] bears the burden of proving the existence and severity of limitations caused by her impairments and the fact that she is precluded from performing her past relevant work"); *Smith v. Sec'y of Health & Human Servs.*, 893 F.2d 106, 109 (6th Cir. 1989). If the plaintiff fails to carry this burden, she must be denied disability benefits.

Once the plaintiff establishes a *prima facie* case that she is unable to perform her prior relevant employment, the burden shifts in step five to the Commissioner to show that the plaintiff can perform other substantial gainful employment, and that such employment exists in significant numbers the national economy. *Longworth v. Comm'r of Soc. Sec.*, 402 F.3d 591, 595 (6th Cir. 2005) (quoting *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir.1997)). *See, e.g., Felisky v. Bowen*, 35 F.3d 1027, 1035 (6th Cir. 1994). To rebut a *prima facie* case, the Commissioner must come forward with proof of the existence of other jobs a plaintiff can perform. *Longworth*, 402 F.3d at 595. *See Kirk v. Sec'y of Health & Human Servs.*, 667 F.2d 524, 528 (6th Cir. 1981), *cert. denied*, 461 U.S. 957, 103 S.Ct. 2428, 77 L.Ed.2d 1315 (1983) (upholding the validity of the medical-vocational guidelines grid as a means for the Commissioner of carrying his burden under appropriate circumstances). It remains the plaintiff's burden to prove the extent of her functional limitations. *Her*, 203 F.3d at 391. Even if the plaintiff's impairment does prevent her from doing her past relevant work, if other work exists in significant numbers in the national economy that the plaintiff can perform, she is not disabled. *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 652 (6th Cir. 2009); *Her*, 203 F.3d at 391. *See also Tyra v. Sec'y of Health & Human Servs.*, 896 F.2d 1024, 1028-29 (6th Cir. 1990); *Farris v. Sec'y of Health & Human Servs.*, 773 F.2d 85, 88-89 (6th Cir. 1985); *Mowery v. Heckler*, 771 F.2d 966, 969-70 (6th Cir. 1985).

If the question of disability can be resolved at any point in the sequential evaluation process, the claim is not reviewed further. 20 C.F.R. § 404.1520(a)(4). *See also Higgs v. Bowen*, 880 F.2d 860, 863 (6th Cir. 1988) (holding that resolution of plaintiff's claim at step two of the evaluative process is appropriate in some circumstances).

**B. The Five-Step Inquiry**

In this case, the ALJ decided the plaintiff's claim at step five of the five step process. (Tr. 11-20.) At step one, the ALJ found that the plaintiff demonstrated that she had not engaged in substantial gainful activity since November 23, 2005, the alleged amended onset date of disability. (Tr. 13.) At step two, the ALJ determined that the plaintiff's diabetes, rheumatoid arthritis, and anxiety were severe impairments and that her coronary artery disease was a non-severe impairment. (Tr. 14.) At step three, the ALJ found that the plaintiff's impairments, either singly or in combination, did not meet or medically equal one of the listed impairments in Appendix 1, Subpart P, Regulation 4. *Id.* At step four, the ALJ determined that the plaintiff had an RFC to perform medium work that allows her to frequently balance, stoop, crouch, crawl, and climb ramps or stairs; to occasionally climb ladders, ropes, and scaffolding; and to perform simple tasks with normal supervision, but also requires her to avoid "concentrated exposure to extreme heat, cold, and vibrations." (Tr. 16.) The ALJ concluded that the plaintiff could not perform her past work as a nurse. (Tr. 19.) At step five, the ALJ concluded that the plaintiff's RFC allowed her to perform work as a food preparation worker, cleaner, and assembler. (Tr. 20.)

**C. Plaintiff's Assertions of Error**

The plaintiff contends that the ALJ failed to fully develop the record, to properly consider Dr. Fox's medical findings and Dr. Kan's medical evaluation, and to properly evaluate the effects of her obesity. Docket Entry No. 12-1, at 8-11, 15-19. She also argues that the ALJ failed to properly evaluate her subjective complaints of pain and erred in assessing her mental limitations, "in relying on the testimony of a [VE]," and in concluding that she had the RFC to perform medium work. Docket Entry No. 12-1, at 9-15, 20-24.

**1. The ALJ fully and fairly developed the record.**

The plaintiff contends that the ALJ failed to fully develop the record. Docket Entry No. 12-1, at 8-9. Specifically, the plaintiff argues that since she was not represented by counsel, the ALJ has a special duty to ensure that the record is fully and fairly developed. *Id.*

In *Sims v. Apfel*, 530 U.S. 103, 110-11, 120 S.Ct. 2080, 147 L.Ed. 2d 80 (2000), the U.S. Supreme Court found that "Social Security proceedings [] are inquisitorial rather than adversarial" and that the ALJ has the duty to "investigate the facts and develop the arguments both for and against granting benefits." *Id.* This language from *Sims* referenced the Court's explanation in *Richardson v. Perales*, 402 U.S. at 411, that the ALJ was to remain nonpartisan and should not act as counsel for the Social Security Administration ("SSA"), but should "act[] as an examiner charged with developing the facts." *Id.* Although the Sixth Circuit in *Lashley v. Secretary of Health and Human Services*, 708 F.2d 1048 (6th Cir. 1983), pointed out that there is no bright line test for determining when an ALJ failed to fully develop the record, it cited with approval decisions of other Circuits that interpreted what it described as the "*Perales* doctrine" and held that a special duty

arises when the plaintiff is unrepresented and unfamiliar with hearing procedures. 708 F.2d at 1051-52.

It is well-established in the Sixth Circuit that the plaintiff, and not the ALJ, has the burden to produce evidence in support of her disability claim. *Wilson v. Comm'r of Soc. Sec.*, 280 Fed.Appx. 456, 459 (6th Cir. May 29, 2008) (citing 20 C.F.R. § 404.15129(a)). *See also Struthers v. Comm'r of Soc. Sec.*, 101 F.3d 104 (table), 1999 WL 357818, at *2 (6th Cir. May 26, 1999) ("[I]t is the duty of the claimant, rather than the administrative law judge, to develop the record to the extent of providing evidence of mental impairment."); *Landsaw v. Sec. of Health and Human Servs.*, 803 F.2d 211, 214 (6th Cir. 1986) ("The burden of providing a complete record, defined as evidence complete and detailed enough to enable the Secretary to make a disability determination, rests with the claimant. 20 C.F.R. §§ 416.912, 416.913(d)."). *Cf. Wright-Hines v. Comm'r of Soc. Sec.*, 597 F.3d 392, 396 (6th Cir. 2010) (although an "ALJ has an inquisitorial duty to seek clarification on material facts," a plaintiff, who is represented by counsel, must provide a "factual record" relating to the length of her employment when her past work was part of the record and was the basis of the initial decision to deny benefits). However, there is a special, heightened duty requiring the ALJ to develop the record when the plaintiff is "(1) without counsel, (2) incapable of presenting an effective case, and (3) unfamiliar with hearing procedures." *Wilson*, 280 Fed.Appx. at 459 (citing *Lashley*, 708 F.2d at 1051-52).

The special duty requirement is not at issue in this case since the plaintiff was represented by a non-attorney representative, Dennis Oliver, at her hearing.[11] (Tr. 26.) As explained in *Kidd v. Comm'r of Soc. Sec.*, 283 Fed.Appx. 336, 345 (6th Cir. June 25, 2008), "federal regulations permit

---

[11] Dennis Oliver describes himself as a "Social Security Consultant." (Tr. 56.)

claimants to choose non-attorneys to represent them at the administrative level." *Id.* (citing 20 C.F.R. § 404.1705(b)).  Further, at the hearing in this case, the plaintiff acknowledged that her non-attorney representative assisted her in amending her alleged onset date (tr. 30) and he also asked her multiple questions about her impairments, prescribed medications, and current job status. (Tr. 34-37.)  The record indicates that the plaintiff was properly represented at her hearing by a non-attorney representative and there is nothing in the record that supports the plaintiff's claim that the ALJ did not fully develop the record or inhibited the plaintiff's non-attorney representative from fully developing the record.

The plaintiff also argues that the ALJ erred by not requesting "any opinions or medical source statements from Dr. Fox," but she provides no authority to support her contention. Docket Entry No. 12-1, at 9.  In *Scott v. Astrue*, 2009 WL 2043639, at *11 (E.D. Tenn. July 9, 2009), the plaintiff made a similar argument and cited to 20 C.F.R. § 404.1512(e), which provides that an ALJ will re-contact a plaintiff's treating medical source to obtain additional medical evidence if the evidence he received from that treating medical source "is inadequate for us to determine whether you are disabled."[12]  *Id.*  In this case, the record does not indicate that the medical evidence provided

---

[12] 20 C.F.R. § 404.1512(e)(1) provides that
[w]e will first recontact your treating physician or psychologist or other medical source to determine whether the additional information we need is readily available. We will seek additional evidence or clarification from your medical source when the report from your medical source contains a conflict or ambiguity that must be resolved, the report does not contain all the necessary information, or does not appear to be based on medically acceptable clinical and laboratory diagnostic techniques. We may do this by requesting copies of your medical source's records, a new report, or a more detailed report from your medical source, including your treating source, or by telephoning your medical source. In every instance where medical evidence is obtained over the telephone, the telephone report will be sent to the source for review, signature and return.

by Dr. Fox was inadequate and the plaintiff offers no explanation as to why Dr. Fox's medical evidence should be considered inadequate. Docket Entry No. 12-1, at 9. Dr. Fox provided several years of medical evidence on the plaintiff (tr. 384-452, 484-507, 530-92) and the record contained evaluations from a consultative physician (tr. 460-64), a nonexamining DDS psychologist (tr. 465-82) and nonexamining DDS physicians. (Tr. 508-23.) *See also Scott*, 2009 WL 2043639, at *11 ("[T]he ALJ was able to make a disability determination based upon several years of medical evidence . . . .[and] [h]e had the opinion of a Consultative Physician and the opinions of nonexamining State Agency Physicians.") Therefore, the plaintiff's contention that the ALJ failed to request additional "opinions or medical source statements" from Dr. Fox is without merit.

## 2. The ALJ properly considered Dr. Fox's medical findings and Dr. Kan's medical evaluation.

The plaintiff contends that the ALJ failed to properly consider Dr. Fox's medical findings and Dr. Kan's medical evaluation. Docket Entry No. 12-1, at 10-11, 15-19. According to the Regulations, there are three different medical sources who may provide evidence: nonexamining sources, nontreating sources, and treating sources. A nonexamining source is "a physician, psychologist, or other acceptable medical source[13] who has not examined [the claimant] but provides a medical or other opinion in [the claimant's] case." 20 C.F.R. §§ 404.1502, 416.902. A nontreating source is described as "a physician, psychologist, or other acceptable medical source who has examined [the claimant] but who does not have, or did not have, an ongoing treatment relationship with [the claimant]." *Id.* The Regulations define a treating source as "[the claimant's]

_____

[13] The Regulations define acceptable medical sources as licensed physicians, both medical and osteopathic doctors, licensed or certified psychologists, licensed optometrists, licensed podiatrists, and qualified speech-language pathologists. 20 C.F.R. § 404.1513(a).

own physician, psychologist, or other acceptable medical source who provides [the claimant] or has provided [the claimant] with medical treatment or evaluation and who has, or has had, an ongoing treatment relationship with [the claimant]." *Id.* The Regulations characterize "an ongoing treatment relationship" as a relationship with an "acceptable medical source when the medical evidence establishes that [the claimant] see[s], or [has] seen, the source with a frequency consistent with accepted medical practice for the type of treatment and/or evaluation required for [the claimant's] medical condition(s)." *Id.*

Given the regularity with which Dr. Fox examined the plaintiff, he is classified as a treating source under 20 C.F.R. §§ 404.1502, 416.902. (Tr. 384-452, 484-507, 530-92.) Generally, an ALJ is required to give "controlling weight" to the medical opinion of a treating physician, as compared to the medical opinion of a non-treating physician, if the opinion of the treating source is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record." 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2) (quoted in *Tilley v. Comm'r of Soc. Sec.*, 394 Fed.Appx. 216, 222 (6th Cir. Aug. 31, 2010), and *Hensley v. Astrue*, 573 F.3d 263, 266 (6th Cir. 2009)). This is commonly known as the treating physician rule. *See* Soc. Sec. Rul. 96-2p, 1996 WL 374188 (July 2, 1996); *Wilson*, 378 F.3d at 544 (6th Cir. 2004).

Even if a treating source's medical opinion is not given controlling weight, it is "still entitled to deference and *must be weighed using all of the factors provided in 20 C.F.R. 404.1527 . . . .*" *Fisk v. Astrue*, 253 Fed.Appx. 580, 585 (6th Cir. Nov. 9, 2007) (quoting Soc. Sec Rul. 96-2p, 1996 WL 374188, at *4) (emphasis in original). The ALJ must consider

> (1) the length of the treatment relationship and the frequency of examination; (2) the nature and extent of the treatment relationship; (3) the supportability of the opinion

with respect to relevant evidence such as medical signs and laboratory findings; (4) the consistency of the opinion with the record as a whole; (5) the specialization of the physician rendering the opinion; and (6) any other factor raised by the applicant.

*McGrew v. Comm'r of Soc. Sec.*, 343 Fed.Appx. 26, 30 (6th Cir. Aug. 19, 2009) (citing *Wilson*, 378 F.3d at 544); *Meece v. Barnhart*, 192 Fed.Appx. 456, 461 (6th Cir. Aug. 8, 2006) (quoting 20 C.F.R. § 404.1527(d)(2)-(6)). The ALJ must also provide "good reasons" for the resulting weight given to the treating source. Soc. Sec Rul. 96-2p, 1996 WL 374188, at *5 (citing 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2)); *Cole v. Astrue*, 661 F.3d 931, 937 (6th Cir. 2011); *Brock v. Comm'r of Soc. Sec.*, 2010 WL 784907, at *2 (6th Cir. Mar. 8, 2010). The "good reasons" must be "sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight," *Cole*, 661 F.3d at 937 (quoting Soc. Sec Rul. 96-2p, 1996 WL 374188, at *5), and so that the plaintiff understands the disposition of her case. *Wilson*, 378 F.3d at 544 (citing *Snell v. Apfel*, 177 F.3d 128, 134 (2d Cir. 1999)).

The Sixth Circuit has plainly held that a reversal of a denial of benefits and remand are warranted, even if the record may contain substantial evidence that supports the Commissioner's decision, when the ALJ fails to provide good reasons for discounting the medical opinion of the plaintiff's treating physician. *Friend v. Comm'r of Soc. Sec.*, 375 Fed.Appx. 543, 551 (6th Cir. Apr. 28, 2010) (citing *Wilson*, 378 F.3d at 544). The failure to follow the "the procedural requirement 'of identifying the reasons for discounting the opinions and for explaining precisely how those reasons affected the weight accorded the opinions denotes a lack of substantial evidence, even where the conclusion of the ALJ may be justified based upon the record.'" *Friend*, 375 Fed.Appx. at 551 (quoting *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 243 (6th Cir.2007)). *See*

*also Wilson*, 378 F.3d at 546 ("A court cannot excuse the denial of a mandatory procedural protection simply because . . . there is sufficient evidence in the record for the ALJ to discount the treating source's opinion and, thus, a different outcome on remand is unlikely.").

However, the Sixth Circuit has also determined that there are circumstances when noncompliance with the good reasons requirement is "harmless error," if: "'(1) a treating source's opinion is so patently deficient that the Commissioner could not possibly credit it;' (2) 'if the Commissioner adopts the opinion of the treating source or makes findings consistent with the opinion;' or (3) 'where the Commissioner has met the goal of § 1527(d)(2)-the provision of the procedural safeguard of reasons-even though she has not complied with the terms of the regulation.'" *Friend*, 375 Fed.Appx. at 551 (quoting *Wilson*, 378 F.3d at 547). Should the third situation occur, "the procedural protections at the heart of the rule may be met when the 'supportability' of a doctor's opinion, or its consistency with other evidence in the record, is indirectly attacked via an ALJ's analysis of a physician's other opinions or his analysis of the claimant's ailments." *Friend*, 375 Fed.Appx. at 551 (citing *Nelson v. Comm'r of Soc. Sec.*, 195 Fed.Appx. 462, 470-72 (6th Cir. 2006); *Hall v. Comm'r of Soc. Sec.*, 148 Fed.Appx. 456, 464 (6th Cir. 2006)). The function of the good reason requirement is to provide clarity and transparency to the reviewing body and, more importantly, to the plaintiff, but it is not a "procrustean bed" that requires "an arbitrary conformity at all times." *Friend*, 375 Fed.Appx. at 551.

In this case, the ALJ noted that

[i]n terms of the claimant's impairment, the medical evidence does show that the claimant has a history of diabetes, arthritis, and anxiety. She has received on-going treatment at North Willow Family Medicine[14] and has been prescribed medications to help control her diabetes, arthritis pain, and anxiety. In July 2005, the claimant

---

[14] At North Willow Family Medicine, the plaintiff was treated by Dr. Fox. (Tr. 483-507.)

23

complained of tingling in her hands and feet, which was diagnosed as peripheral neuropathy secondary to diabetes. She was prescribed Neurontin. In November 2006, the claimant was given a steroid injection for arthritic pain. Treatment notes indicate the claimant continued to complain of pain in her back, knees, and hip. In August 2008, the claimant slipped at a retail store and injured her back. She was referred to physical therapy. In October 2008, Dr. Fox indicated the claimant had completed physical therapy and her back pain had ceased. The physician noted the claimant denied any pain with ambulation and she was released to return to full duty/activities.

In May 2009, Dr. Fox noted the claimant's diabetes was under good control on current medications, her diabetic neuropathy was stable on current medical regimen, and her anxiety disorder was stable with medications. Recent treatment notes in July 2009 indicated the claimant had complaints of lower back pain and knee pain. Dr. Fox noted her spine range of motion was slightly decreased secondary to pain, however the range of motion in her lower extremities was normal. The physician indicated the claimant denied weakness and numbness in her legs; however, she reported limitations in lifting and climbing stairs. Dr. Fox recommended the claimant continue taking regular pain medications.

(Tr. 18) (internal citations omitted).

The plaintiff correctly argues that the ALJ did not assign a specific amount of weight to Dr. Fox's medical findings and failed to comply with the good reasons requirement (Docket Entry No. 12-1, at 15-19), but his noncompliance is harmless error since his final determination was consistent with Dr. Fox's medical findings. The ALJ concluded that the plaintiff's diabetes, rheumatoid arthritis, and anxiety were severe impairments and he pointed to Dr. Fox's diagnoses and prescribed medications as support for that determination. (Tr. 14.) Additionally, as addressed by the Commissioner (Docket Entry No. 17, at 19), Dr. Fox never found that the plaintiff's mental or physical impairments limited her ability to do work and he did not recommend that she adjust her daily activities due to her mental or physical impairments.

Next, the plaintiff contends that Dr. Fox concluded that her "condition and pain were aggravated by activities of daily living, climbing stairs, and lifting" (Docket Entry No. 12-1, at 17),

but Dr. Fox never made that determination. (Tr. 574, 590.) In April and July of 2009, it was the plaintiff who related to Dr. Fox that her pain was aggravated by her activities of daily living, climbing stairs, and lifting (tr. 574, 590), and she incorrectly equated her own statements to Dr. Fox's opinion. Further, between July of 2008 and July of 2009, the plaintiff related to Dr. Fox that, after taking her medication and doing physical therapy, her back was pain free and felt normal (tr. 561), that her lower back pain was "resolved" (tr. 564), and that she was doing "fairly well . . . except for pain and numbness at times in her legs" (tr. 571), and he noted that her lower back pain, muscle spasms, osteoarthritis, and anxiety were stable. (Tr. 539, 569, 573, 581.) In sum, although the ALJ did not specify the weight that he assigned to Dr. Fox's findings, he relied heavily upon Dr. Fox's treatment notes in making his RFC determination, thus satisfying the second prong of *Wilson's* harmless error provision.

The Court also disagrees with the plaintiff's contention that the ALJ should have "given greater weight" to Dr. Kan's medical evaluation, since he examined the plaintiff, than to "the opinions of the non-treating, non-examining state agency consultants." Docket Entry No. 12-1, at 10. Dr. Kan is classified as a nontreating examining source because he examined the plaintiff on one occasion. 20 C.F.R. §§ 404.1502, 416.902. *See also See Smith v. Comm'r of Soc. Sec.*, 482 F.3d 873, 876 (6th Cir. 2007) (a single examination of a patient by a doctor does not provide the requisite linear frequency to establish an "ongoing medical treatment relationship"); *Abney v. Astrue*, 2008 WL 2074011, at *11 (E.D. Ky. May 13, 2008) (a psychiatrist who met with the plaintiff one time and signed a psychological assessment of that visit was not a treating physician because one meeting "clearly cannot constitute the 'ongoing treatment relationship'" described in 20 C.F.R. § 404.1502)

The medical findings of an examining source do not automatically receive more weight than the findings of a nonexamining source simply because the examining source has examined the plaintiff. *See* 20 C.F.R. §§ 404.1527(d), 416.927(d). In weighing Dr. Kan's medical evaluation, since he is a nontreating examining source, the Regulations require the ALJ to evaluate his medical findings in light of

> (1) the length of the treatment relationship and the frequency of examination; (2) the nature and extent of the treatment relationship; (3) the supportability of the opinion with respect to relevant evidence such as medical signs and laboratory findings; (4) the consistency of the opinion with the record as a whole; (5) the specialization of the physician rendering the opinion; and (6) any other factor raised by the applicant.

20 C.F.R. §§ 404.1527(d)(2)-(6), 416.927(d)(2)-(6).

The ALJ relied on the factor of supportability in assigning "appropriate" weight to Dr. Kan's medical evaluation. (Tr. 16.) The ALJ explained that

> [o]n September 24, 2007, Dr. Kan conducted a consultative examination. Dr. Kan noted the claimant did not have any limitations with the range of motion in her neck, shoulders, elbows, wrists, hands, knees, or ankles. She was able to perform half of the squatting maneuver. Dr. Kan indicated the claimant's gait was relatively slow and she had difficulty walking on her tiptoes and heels; however, she did not require any assistive devices. Dr. Kan did note that the claimant was observed walking and driving without difficulty outside of the office. According to Dr. Kan, the claimant is able to lift light weights,[15] stand/walk for one to two hour periods, and sit for about 6 hours in an 8 hour work day. The undersigned notes that Dr. Kan's assessment was made without the benefit of full medical records, diagnostic and radiological testing, and is therefore given appropriate weight.

*Id.* (internal citations omitted).

Although Dr. Kan examined the plaintiff and concluded that she could only "stand/walk for one to two hour periods [] and sit for about 6 hours in an 8 hour work day," he also found that she

---

[15] Actually, Dr. Kan "estimated" that the plaintiff "may be able to occasionally lift light weights." (Tr. 463.)

had a slow but steady gait and "4/5 to 5/5 strength of the upper extremities . . . [and] 4/5 in both lower extremities;" revealed that he did not have "the benefit of full medical records [or] diagnostic radiological and neuropsychological testing" when making his findings; and noted that when the plaintiff left his office she was observed "walking and driving without difficulties when compared to her performance in the office where she was hardly able to move." (Tr. 461-64.)  In sum, the limitations that Dr. Kan assigned to the plaintiff in his medical evaluation did not accurately reflect the plaintiff's physical limitations since Dr. Kan did not have the plaintiff's "full medical records" or "diagnostic [and] radiological and neurophysiological testing" and since she was able to walk without difficulty once she left his office. (Tr. 463-64.)  Therefore, the ALJ did not err in assigning "appropriate weight" to Dr. Kan's medical evaluation.  He also complied with 20 C.F.R. §§ 404.1502(d) and 416.902(d) by focusing on the factor of supportability and there is substantial evidence in the record to support his determination.


   **3. The ALJ properly considered the plaintiff's obesity.**

   The plaintiff argues that the ALJ erred by failing to "address the claimant's obesity, or the combined impact of her obesity and other impairments, at any step of the sequential evaluation as required by SSR 02-1p." Docket Entry No. 12-1, at 19.  SSR 02-01p, which details the SSA's policy on obesity, provides that even though the SSA no longer classifies obesity as a listed impairment, adjudicators must still consider its effects when evaluating an individual's residual functional capacity.  Soc. Sec. Rul. 02-01p, 2000 WL 628049, at *1.  SSR 02-01p further explains that "[a]n assessment should also be made of the effect obesity has upon the individual's ability to perform routine movement and necessary physical activity within the work environment," 2000 WL 628049,

at *6, but it does not offer "'any particular procedural mode of analysis for disability claimants.'" *Coldiron v. Comm'r of Soc. Sec.*, 391 Fed.Appx. 435, 442-43 (6th Cir. Aug. 12, 2010) (quoting *Bledsoe v. Barnhart*, 165 Fed.Appx. 408, 412 (6th Cir. Jan. 31, 2006)).

An ALJ is allowed to use his "judgment to establish the presence of obesity based on the medical findings and other evidence in the case record, even if a treating source has not indicated a diagnosis of obesity." Soc. Sec. Rul. 02-01p, 2000 WL 628049, at *3. Obesity is a severe impairment if "alone or in combination with another medically determinable physical or mental impairment(s), it significantly limits an individual's physical or mental ability to do basic work activities." *Id*. at *5. As with other impairments, the plaintiff is generally charged with proving that she is disabled, and she must provide evidence that the ALJ can use to reach conclusions about her alleged medical impairments. *Cranfield v. Comm'r of Soc. Sec.*, 79 Fed.Appx. 852, 857 (6th Cir. Nov. 3, 2003); 20 C.F.R. § 404.1512(a).

In this case, the record does not indicate that the plaintiff was diagnosed with obesity (tr. 184-612) and she does not provide any evidence that her weight hindered her ability to work.[16]

---

[16] The plaintiff provides that she is five feet tall and weighed 151 pounds in November 2006, and 150 pounds in January of 2007, but she does not offer any further explanation or support as to how her height and weight classifies her as obese. Docket Entry No 12-1, at 18-19. According to the Centers for Disease Control and Prevention ("CDC"), Body Mass Index ("BMI") "is one of the best methods for population assessment of overweight and obesity." CDC, "Healthy Weight- it's not a diet, it's a lifestyle," at http://www.cdc.gov/healthyweight/assessing/bmi/adult_bmi/index.html. A person with a BMI of 30 or more is considered obese. *Id.* Since the plaintiff is five feet tall, or 60 inches in height, she must weigh at least 153 pounds to have a BMI of 30. National Heart Lung and Blood Institute, "Body Mass IndexTable 1," at http://www.nhlbi.nih.gov/guidelines/obesity/ bmi_ tbl.htm. Although the record indicates that the plaintiff's weight fluctuated between 128 and 164 pounds (tr. 392, 394, 396, 398, 401, 403, 406, 409, 411, 414, 420, 423, 431, 485, 538, 563, 572, 575, 580, 588, 591), her weight equaled or surpassed the 153 pound threshold on only two occasions: in May of 2006, she weighed 164 pounds (tr. 406), and in July of 2008, she weighed 153 pounds. (Tr. 538.) The plaintiff's weight was under 153 pounds for the vast majority of her alleged period of disability, which is likely why none of her examining physicians diagnosed her with obesity.

Further, when the plaintiff was asked by her representative why she is not able to work full time, the plaintiff replied that she is not able to lift, pull, or grip with her hands due to arthritis, to stand for more than five minutes, or to walk "far" due to diabetic neuropathy in her feet that causes numbness and stinging; that she occasionally has chest pain due to coronary artery disease; and that her physical pain causes anxiety. (Tr. 31-33.) At her hearing, the plaintiff never attributed her inability to work to obesity. (Tr. 26-41.) Since the plaintiff did not provide any evidence as to how her alleged obesity affected her work, the ALJ "was not required to give obesity any express consideration." *Bush v. Astrue*, 2011 WL 3444072, at *15 (M.D. Tenn. Aug. 8, 2011) (Nixon, J.). *See also Reynolds v. Comm'r of Soc. Sec.*, 424 Fed.Appx. 411, 416 (6th Cir. Apr. 1, 2011) ("[The plaintiff] did not put her obesity at issue in the proceedings below: she did not list obesity as one of her impairments, or list it as one of her difficulties on any paperwork put before the various levels of review. More importantly, she did not present evidence from any physician who described her as obese, much less who opined that her weight imposed additional limitations upon her or exacerbated her other conditions. Therefore, even if [the plaintiff's] silence on the issue of obesity is not deemed to waive consideration of that issue, it does not appear that evidence existed regarding her obesity that the ALJ should have considered.").

### 4. The ALJ did not err in analyzing the credibility of the plaintiff's subjective complaints of pain.

The plaintiff contends that the ALJ erred in evaluating the credibility of her subjective complaints of physical pain by finding her not fully credible. Docket Entry No. 12-1, at 20-22. Specifically, the plaintiff argues that her subjective complaints of pain are supported by Dr. Fox's

findings and that her ability to perform simple activities of daily living does not mean that she "possesses an ability to engage in substantial gainful activity." *Id.*

In evaluating the plaintiff's credibility, the ALJ noted that he must first determine whether the plaintiff has an underlying mental or physical impairment and that he must then assess the "intensity, persistence, and limiting effects" of that impairment. (Tr. 17.) The ALJ concluded that

> [a]fter careful consideration of the evidence, the undersigned finds that the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the above residual functional capacity assessment.
>
> * * *
>
> The claimant's testimony during the hearing regarding limitations with the use of her hands is not fully credible. Although she has been treated for diabetic neuropathy, the medical record does not show any significant problems with her hands. There is no evidence in the record of any recent reports to treating sources of significant problems or limitations with the use of her hands. The undersigned is not persuaded that the claimant is wholly credible regarding her allegations, since the consultative examiner noted the claimant was hardly able to move during the examination; however, he observed her able to walk without difficulty after she left his office.
>
> Mrs. Fletcher has reported daily activities that are consistent with a wide range of activities of daily living. She indicated she is able to independently handle her own personal care. She takes her medications without any assistance. She is able to drive. She is able to shop in stores once or twice a week. She is able to use a riding lawn mower to do yard work. Taken together, these activities of daily living are given significant weight as to the claimant's ability to sustain substantial gainful activity.
>
> Although the claimant has received treatment for her alleged disabling impairments, that treatment has been essentially routine and/or conservative in nature. Her diabetes, arthritis, and anxiety are controlled with medication. She has not been seen by an orthopedic or arthritic specialist. She has not been seen by a psychiatrist or psychologist. The undersigned notes that no treating physician has found the claimant has physical limitations precluding her ability to work.
>
> The claimant did not display any severe pain or discomfort while testifying at the hearing. While the hearing was short-lived and cannot be considered a conclusive indicator of the claimant's overall sitting discomfort, the apparent lack of discomfort during the hearing is given slight weight in reaching the conclusion regarding the

credibility of the claimant's allegations and the claimant's residual functional capacity.

(Tr. 17-19) (internal citations omitted).

The ALJ is charged with evaluating the credibility of the plaintiff at the hearing, and the ultimate decision of credibility rests with the ALJ. The ALJ's credibility finding is entitled to deference "because of the ALJ's unique opportunity to observe the claimant and judge her subjective complaints." *See Buxton v. Halter*, 246 F.3d 762, 773 (6th Cir. 2001) (internal citations omitted). However, "[i]f the ALJ rejects the claimant's complaints as incredible, he must clearly state his reasons for doing so." *Wines v. Comm'r of Soc. Sec.*, 268 F. Supp.2d 954, 958 (N.D. Ohio 2003) (citing *Felisky*, 35 F.3d at 1036).

Social Security Ruling 96-7p emphasizes that credibility determinations must find support in the record, and not be based upon the "intangible or intuitive notion[s]" of the ALJ. 1996 WL 374186, at *4. In assessing the plaintiff's credibility, the ALJ must consider the record as a whole, including the plaintiff's complaints, lab findings, information provided by treating physicians, and other relevant evidence. *Id.* at *5. Consistency between the plaintiff's subjective complaints and the record evidence "tends to support the credibility of the claimant, while inconsistency, although not necessarily defeating, should have the opposite effect." *Kalmbach v. Comm'r of Soc. Sec.,* 2011 WL 63602, at *11 (6th Cir. Jan. 7, 2011). The ALJ must explain his credibility determination such that both the plaintiff and subsequent reviewers will know the weight given to the plaintiff's statements and the reason for that weight. Soc. Sec. Rul. 96-7p, 1996 WL 374186, at *4.

Both the SSA and the Sixth Circuit have enunciated guidelines for use in analyzing a plaintiff's subjective complaints of pain. See 20 C.F.R. § 404.1529; *Felisky*, 35 F.3d at 1037. While the inquiry into subjective complaints of pain must begin with the objective medical record, it does

not end there.  The Sixth Circuit in *Duncan v. Sec'y of Health and Human Servs.*, 801 F.2d 847 (6th Cir. 1986), set forth the basic standard for evaluating such claims.[17]  The *Duncan* test has two prongs.  The first prong is whether there is objective medical evidence of an underlying medical condition.  *Felisky*, 35 F.3d at 1039 (quoting *Duncan*, 801 F.2d at 853).  The second prong has two parts: "(1) whether objective medical evidence confirms the severity of the alleged pain arising from the condition; or (2) whether the objectively established medical condition is of such a severity that it can reasonably be expected to produce the alleged disabling pain." *Id.*  This test does not require objective evidence of the pain itself. *Duncan*, 801 F.2d at 853 (quoting *Green v. Schweiker*, 749 F.2d 1066, 1071 (3rd Cir. 1984)).

In this case, the ALJ concluded that the plaintiff's "medically determinable impairments could reasonably be expected to cause the alleged symptoms," thus satisfying the first prong of the *Duncan* test. (Tr. 19.)  Given that the second prong of the *Duncan* test consists of two alternatives, the plaintiff must only meet one of the following two elements: the objective medical evidence "confirms the severity of the alleged pain arising from the condition" or the "objectively established medical condition is of such a severity that it can reasonably be expected to produce the alleged disabling pain."  The SSA provides a checklist of factors to assess symptoms, including pain, in 20 C.F.R. § 404.1529(c).  The ALJ cannot ignore a plaintiff's statements detailing the symptoms, persistence, or intensity of her pain simply because current objective medical evidence does not fully corroborate the plaintiff's statements. 20 C.F.R. § 404.1529(c)(2).  Besides reviewing medical

---

[17] Although *Duncan* only applied to determinations made prior to 1987, the Sixth Circuit has since held that *Duncan* continues to apply to determinations made after 1987. *See Felisky*, 35 F.3d at 1039 n.2.

records to address the credibility of a plaintiff's symptoms of pain, an ALJ must review the entire case record in light of the seven factors set forth in 20 C.F.R. § 404.1529(c)(3).[18]

In making his credibility determination, the ALJ relied on the medical records from examining sources, the effectiveness of the plaintiff's medication, and her daily activities. (Tr. 18-19.) The ALJ explained that Dr. Fox found the plaintiff's diabetic neuropathy and anxiety to be stable on medication (tr. 18, 539, 569, 573, 579) and her range of motion in her lower extremities to be normal (tr. 591); that Dr. Kan noted that the plaintiff was able to walk without difficulty after she left his office even though she was "hardly able to move" when he examined her (tr. 18, 463-64); and that the medical record evidence did not indicate a significant impairment with her hands since she complained of hand pain on only two occasions, in July and September of 2006. (Tr. 18, 400, 417.) The plaintiff also related to Dr. Fox that after taking her medication and doing physical therapy, her back was pain free and she "fe[lt] back to normal" (tr. 561), that her lower back pain was "resolved" (tr. 564), and that she was doing "fairly well . . . except for pain and numbness at times in her legs." (Tr. 571.)

In sum, the medical records from examining and nonexamining sources, the effectiveness of the plaintiff's medication, her daily activities, and her own statements demonstrate that her

_____

[18] The seven factors under 20 C.F.R. § 404.1529(c)(3) include: (i) the plaintiff's daily activities, (ii) the location, duration, frequency, and intensity of the plaintiff's pain or other symptoms, (iii) precipitating and aggravating factors, (iv) the type, dosage, effectiveness and side effects of any medication the plaintiff takes or has taken to alleviate pain or other symptoms, (v) treatment, other than medication, plaintiff received or has received for relief of pain or other symptoms, (vi) any measures plaintiff uses or has used to relieve pain or other symptoms (e.g. lying flat on her back, standing for 15 to 20 minutes every hour, sleeping on a board, etc.), and (vii) other factors concerning plaintiff's functional limitations and restrictions due to pain or other symptoms. 20 C.F.R. § 404.1529(c)(3).

impairments cause her a certain amount of pain, but that same record medical evidence does not support her subjective complaints that her pain is disabling.

The Court also disagrees with the plaintiff's assertions that the ALJ relied too heavily on her ability to perform "simple functions" and on "her failure to display outward manifestations of pain at the hearing." Docket Entry No. 12-1, at 12, 22. The plaintiff correctly cites *Meece*, 192 Fed.Appx. at 461, as support for her position that simply because she is able to perform basic activities of daily living, "such as driving, grocery shopping, dish washing, and floor sweeping, does not necessarily indicate that [she] possesses the ability to engage in substantial gainful activity." Docket Entry No. 12-1, at 21. In *Meece*, the Court found that the ALJ's reliance on the plaintiff's activities of daily living was just one of several factors upon which he erroneously relied in determining that the plaintiff's subjective complaints of pain were not disabling.192 Fed.Appx. at 461-67. However, in this case the plaintiff's activities of daily living were just one of several factors upon which the ALJ properly relied when he assessed the plaintiff's credibility. (Tr. 18-19.) *See also Rice v. Comm'r of Soc. Sec.*, 2012 WL 529537, at *4 (S.D. Ohio Feb. 17, 2012) (Plaintiff's "point that the 'ability to perform occasional household duties was not the same as those required for continuous employment' [had] no bearing on the ALJ's actual analysis" since "[t]he ALJ never equated occasional household duties with his finding of non-disability. . . . [and] Plaintiff's activities of daily living were one factor among many used to judge the credibility of Plaintiff's reports of pain.").

Additionally, the plaintiff overstates the emphasis that the ALJ placed on her demeanor at her hearing. The plaintiff correctly argues that an ALJ is prohibited from rejecting "a claimant's subjective complaints of pain based solely upon the ALJ's failure to observe outward manifestations

of pain during an administrative hearing." Docket Entry No. 12-1, at 12. The ALJ did note that the plaintiff "did not display any severe pain or discomfort while testifying at the hearing" and noted that "[w]hile the hearing was short-lived and cannot be considered a conclusive indicator of the claimant's overall sitting discomfort, the apparent lack of discomfort during the hearing is given slight weight in reaching the conclusion regarding the credibility of the claimant's allegations and the claimant's residual functional capacity."[19] (Tr. 19.) Yet, as discussed *supra*, in assessing the plaintiff's subjective complaints of pain the ALJ relied on medical records from her examining sources, the effectiveness of her medication, and her daily activities, and not "solely" on her appearance at her hearing. *See also Johnson v. Comm'r of Soc. Sec.*, 210 F.3d 372, 2000 WL 332059, at *4 (6th Cir. Mar. 22, 2000) (In concluding that the ALJ did not "subject [the] [p]laintiff to a 'sit/squirm ordeal,'" the Court noted that "[t]he ALJ's personal observation was one of several factors, not the sole factor, in determining that [the] [p]laintiff's pain was not disabling.").

**5. The ALJ properly evaluated the severity of the plaintiff's mental impairments.**

The plaintiff argues that the ALJ failed to properly evaluate her anxiety and depression. Docket Entry No. 12-1, at 22-24. Specifically, the plaintiff contends that the ALJ did not give proper weight to her "years of anxiety and depression documented" by Dr. Fox or to the findings of Mr. Hardison, a consultative psychological examiner. *Id.*

When assessing the severity of a plaintiff's mental impairment, the ALJ's written decision must include findings based upon a "special technique." 20 C.F.R. §§ 404.1520a(a). The special technique is a series of steps delineated in subsections (b) through (e) of 20 C.F.R. § 404.1520a.

---

[19] The court notes that the ALJ may have less ability to observe the plaintiff when the proceeding is conducted by video rather than on-site.

First, the ALJ is required to evaluate the plaintiff's "pertinent symptoms, signs, and laboratory findings to determine whether [the plaintiff has] a medically determinable mental impairment(s)."[20] 20 C.F.R. § 404.1520a(b)(1). Next, the ALJ must assess the plaintiff's degree of functional limitation caused by the mental impairment. 20 C.F.R. § 404.1520a(b)(2). The regulations acknowledge the individualized nature of this step by requiring the ALJ "to consider multiple issues and all relevant evidence to obtain a longitudinal picture of [the plaintiff's] overall degree of functional limitation." 20 C.F.R. § 404.1520a(c)(1). Thus, the ALJ must "consider all relevant and available clinical signs and laboratory findings, the effects of [the plaintiff's] symptoms, and how [the plaintiff's] functioning may be affected by factors including, but not limited to, chronic mental disorders, structured settings, medication, and other treatment." *Id.*

After considering all the available relevant evidence, the ALJ must rate the plaintiff's functional limitation in the four following functional areas: activities of daily living; social functioning; concentration, persistence, or pace; and episodes of decompensation. 20 C.F.R. § 404.1520a(c)(3). These four functional limitations are known as the "B" criteria. The term "B criteria" corresponds to the paragraph "B" criteria of the expansive list of mental disorders in 20 C.F.R. Pt. 404, Subpt. P, App. 1. The regulations require the ALJ to attach a point value to each of the four functional areas. 20 C.F.R. § 404.1520a(c)(4). For the first three categories, the regulations set forth a five-point assessment scale: none, mild, moderate, marked, and extreme. *Id.* The fourth category, episodes of decompensation, is rated with a four point scale: none, one or two, three, four or more. *Id.* "If the ALJ rates the first three functional areas as 'none' or 'mild' and the

_____

[20] If the ALJ determines that the plaintiff has a medically determinable mental impairment, the ALJ must provide detailed support for such findings in accordance with 20 C.F.R. § 404.1520a(e).

fourth area as 'none,' the impairment is generally not considered severe and the [plaintiff] is conclusively not disabled." *Rabbers,* 582 F.3d at 653 (quoting 20 C.F.R. § 404.1520a(d)(1)).

The ALJ is also required to follow 20 C.F.R. § 404.1520a(e) in documenting the application of the special technique. The ALJ's written decision must include the germane findings and conclusions based on the special technique; show the plaintiff's significant history, such as medical examinations and laboratory findings, and the functional limitations considered in determining the severity of the plaintiff's mental impairments; and provide a specific finding regarding the level of the plaintiff's limitation in each of the four functional areas listed in 20 C.F.R. § 404.1520a(c)(3).[21] 20 C.F.R. § 404.1520a(e)(2).

The ALJ complied with the Regulations by using the special technique to conclude that the plaintiff's activities of daily living; social functioning; and concentration, persistence, and pace were only moderately limited, and that she had experienced no episodes of decompensation. (Tr. 15.) He relied on Dr. Livingston's PRTF and mental RFC as support for his findings, but he also considered Dr. Fox's treatment notes and Mr. Hardison's psychological evaluation. (Tr. 15-16.) Both Dr. Fox and Mr. Hardison[22] diagnosed the plaintiff with depression and anxiety (tr. 384, 388, 386, 398, 401, 403, 406, 410, 412, 417, 421, 455-59, 557, 569, 581), and the plaintiff argues that, if the ALJ had given proper weight to their findings, he would not have concluded that she was

---

[21] Since 2000, the ALJ is no longer required to complete a Psychiatric Review Technique Form ("PRTF"). *Rabbers*, 582 F.3d at 653-54. The regulations only require that an ALJ's written decision "incorporate the pertinent findings and conclusions based on the [special] technique." *Id.* (quoting 20 C.F.R. § 404.1520a(e)(2)).

[22] The plaintiff refers to Mr. Hardison as a doctor in her brief (Docket Entry No. 12-1, at 23), but Mr. Hardison has only attained a master's level degree. (Tr. 455.)

"capable of performing medium work with the only included non-exertional limitation as an ability to perform simple tasks with normal supervision." Docket Entry No. 12-1, at 24.

First, as discussed *supra*, the ALJ assigned the proper weight to Dr. Fox's findings. Next, there is nothing in Dr. Fox's treatment notes or in Mr. Hardison's psychological evaluation that undercuts the ALJ's determination that the plaintiff suffered from only moderate limitations. Dr. Fox noted that the plaintiff's anxiety was stable on medication (tr. 569, 581) and Mr. Hardison concluded that the plaintiff was not significantly limited in her ability "to remember and carry out basic 1- and 2-step instructions," "to remember and carry out somewhat more detailed instructions," "to respond appropriately to change in a routine work setting including being aware and take appropriate precautions regarding normal hazards," and "to set realistic goals and make plans independently," and that she was mild to moderately limited in her ability "to sustain concentration and persistence" and to interact socially. (Tr. 458.) Finally, as noted by the ALJ, although Dr. Fox examined the plaintiff from 2004 to 2009, he did not refer her to a mental health professional for treatment. (Tr. 18.)

The ALJ properly evaluated the plaintiff's mental impairments by using the special technique and the record medical evidence, including Dr. Fox's treatment notes, Mr. Hardison's psychological evaluation, and Dr. Livingston's PRTF and mental RFC, support his determination that the plaintiff's activities of daily living; social functioning; and concentration, persistence, and pace were only moderately limited, and that she had experienced no episodes of decompensation.

**6. The ALJ did not err in relying on the VE's testimony.**

The plaintiff contends that the "ALJ failed to consider the claimant's subjective complaints and limitations, mental conditions, and mental limitations in determining the claimant's residual functional capacity and in questioning the vocational expert." Docket Entry No. 12-1, at 24. The Regulations allow ALJs to rely on a VE at step five to determine whether a plaintiff is able to perform any work. 20 C.F.R. § 404.1560(c). The VE's testimony, in response to an ALJ's hypothetical question, will be considered substantial evidence only if that hypothetical question "'accurately portray[s] [the plaintiff's] physical and mental impairments.'" *Cole*, 661 F.3d at 939 (quoting *Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 512 (6th Cir.2010)). Although a hypothetical must accurately portray a plaintiff's impairments, an ALJ is required to incorporate only those limitations that he accepts as credible. *Infantado v. Astrue*, 263 Fed.Appx. 469, 476-77 (6th Cir. 2009); *Griffeth v. Comm'r of Soc. Sec.*, 217 Fed.Appx. 425, 429 (6th Cir. 2007).

As discussed in detail above, the ALJ, after evaluating the medical records from the plaintiff's examining and nonexamining sources, the effectiveness of her medication, her daily activities, and her own statements, properly assessed the plaintiff's "subjective complaints and limitations, mental conditions, and mental limitations" (Docket Entry No. 12-1, at 24), and the hypotheticals that he asked the VE reflected those assessments. (Tr. 37-40.) The ALJ concluded that the plaintiff could perform medium work but that she "must avoid concentrated exposure to extreme heat, cold, and vibrations" (tr. 16), and this RFC determination is supported by substantial evidence in the record.

The plaintiff also contends that the ALJ "erred by finding that [she] has the [RFC] to perform medium work" and as support for her position she argues that the ALJ erred in concluding that her

coronary artery disease was not a severe impairment, in assessing the findings of Dr. Fox and Dr. Kan, and in evaluating her subjective complaints of pain. Docket Entry No. 12-1, at 9-15. The ALJ properly determined that the plaintiff's coronary artery disease was not a severe impairment. According to 20 C.F.R. § 404.1520(c), which codifies step two of the five step sequential process, an impairment is considered severe if that impairment "limits your physical or mental ability to do basic work activities." *See also* 20 C.F.R. § 404.1521 ("An impairment or combination of impairments is not severe if it does not significantly limit your physical or mental ability to do basic work activities."); *Murphy v. Sec'y of Health & Human Servs.*, 801 F.2d 182, 185 (6th Cir. 1986) ("An impairment can be considered not severe only if the impairment would not affect the plaintiff's ability to work regardless of his age, education, and work experience.") (citing *Salmi v. Sec'y of Health & Human Servs.*, 774 F.2d 685, 691-92 (6th Cir. 1985); *Farris v. Sec'y of Health & Human Servs.*, 773 F.2d 85, 90 (6th Cir. 1985)).

In 2002, the plaintiff underwent a "stent deployment" in her right coronary artery. (Tr. 186-98.) In 2004, a nuclear stress test revealed that the plaintiff was "clinically negative for chest pain and electrocardiographically negative for ischemic EKG changes" (tr. 445) and between 2007 and 2009, Dr. Fox noted on several occasions that the plaintiff's coronary artery disease was stable. (Tr. 496, 500, 533, 569.) Additionally, the plaintiff does not cite to any medical evidence in the record to support her contention that her coronary disease significantly affects her; and the record medical evidence simply does not indicate that her coronary artery disease is a severe impairment.

The Court will also not address the plaintiff's two remaining sub-arguments that the ALJ erred in assessing the findings of Dr. Fox and Dr. Kan and in evaluating her subjective complaints

of pain. Docket Entry No. 12-1, at 9-15.  The plaintiff raised both supporting arguments as separate independent assertions of error in her brief and the Court addressed both of those assertions *supra*.

## V.  RECOMMENDATION

For the above stated reasons, it is recommended that the plaintiff's motion for judgment on the administrative record (Docket Entry No. 12) be DENIED and that this action be DISMISSED.

Any objections to this Report and Recommendation must be filed with the Clerk of Court within fourteen (14) days of service of this Report and Recommendation and must state with particularity the specific portions of the Report and Recommendation to which objection is made. Failure to file written objections within the specified time can be deemed a waiver of the right to appeal the District Court's Order regarding the Report and Recommendation.  *See Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).

Respectfully submitted,


JULIET GRIFFIN
United States Magistrate Judge